[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 18, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-14294

_____

D. C. Docket No. 01-03066-CV-2

GREENBRIAR VILLAGE, L.L.C.,

Plaintiff-Appellee-
Cross-Appellant,

versus

MOUNTAIN BROOK, CITY,

Defendant-Appellant-
Cross-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(September 18, 2003)**

Before BIRCH and HULL, Circuit Judges, and EDENFIELD[*], District Judge.

_____

[*]Honorable B. Avant Edenfield, United States District Judge for the Southern District of
Georgia, sitting by designation.

PER CURIAM:

In this case, a municipality issued a land disturbance permit for a residentially-zoned piece of property. The work to be accomplished under the permit was for the admitted purpose of developing the property commercially, that is, for a purpose inconsistent with the property's zoning status at that time, and the permit did not contain an explicit expiration date. After years of litigation over the proper scope of the disturbance activity, and, correlatively, years of the property languishing in a terminally disturbed state, the municipality passed a revised ordinance that resulted in the permit's revocation. The landowner claimed violations of his due process rights.

The question in this case, essentially, is whether constitutional due process was due. We find that substantive due process concerns are not implicated by the actions of the City in this case, and so affirm the district court's decision for the City on that claim. We find, however, that the district court erred in recognizing a federally protectable right as to Greenbriar, and, therefore, in holding that the City violated Greenbriar's procedural due process rights.

## I. BACKGROUND

The factual findings of the district court, following a bench trial, are essentially undisputed. The crucial portions of those findings follow. Greenbriar

Village LLC ("Greenbriar") owns a 10-acre piece of property at the intersection of Green Valley Road and U. S. Highway 280 in the city of Mountain Brook, Alabama (the "City"). This property is zoned for residential use and has been so zoned since Greenbriar purchased the property in 1990.

Over the last decade, Greenbriar has repeatedly contended that the property is not suitable for residential use and has used all available avenues to attempt to convince the City to re-zone the property for commercial activity. In 1992, Greenbriar applied for and was denied re-zoning of the property for use as an office development. In 1997, Greenbriar filed a request for re-zoning, again denied, to support a proposed "Greenbriar Village" shopping center, which would include retail stores, a grocery store, and a gas station. Greenbriar brought suit to challenge this denial, but lost in the trial court and eventually abandoned appeal because of an inadequate transcript.

On 17 February 1998, Greenbriar applied to the City for a land disturbance permit (the "Permit"), which the City issued on 18 March 1998. The Permit seemed to authorize the clearing of a commercial site. It is uncontested that Greenbriar's entire purpose for obtaining the Permit was to prepare for the eventuality of the property being re-zoned for commercial use. The Permit itself contained no expiration date, and the applicable ordinances at the time did not

3

provide for automatic expiration. Greenbriar used the Permit to clear the property, remove accumulated garbage and, later, move trees and earth. Under the authority of the Permit, Greenbriar has stockpiled tons of rock and fill material on the property over the last several years. Greenbriar has never proffered a residential purpose for clearing the land, and the activity to date on the land does not seem in any way directed toward that end.

Though the Permit was issued for the clearing of a commercial site, the City's attorney, upon realizing the disconnect, specifically informed Greenbriar that the Permit did not authorize any use contrary to the current zoning status of the property. The City's attorney noted that it seemed incongruous for a landowner to apply for a disturbance permit when the purpose to which he wanted to put the property had not yet been approved, but he could find no reason under the zoning scheme to deny a permit for that reason.

In March 1999, Greenbriar applied yet again for re-zoning for commercial use, and this request was denied yet again in October 1999. Greenbriar again challenged this denial in state court. During the pendency of this action, the City ordered Greenbriar to stop work under the Permit, and Greenbriar challenged that order in a mandamus proceeding in state court. The state court found that the Permit authorized the clearing activity underway on Greenbriar's property and

4

directed the City to rescind the stop-work order immediately. Thus, from 1998 to 2001, Greenbriar used the Permit to conduct various land improvement projects on the property. It is uncontested that, even after three years, the property was in an unfinished state; no residential use had been advanced through the disturbance work, and no commercial use had been authorized by the City through re-zoning.

In September 2001, and in the context of the above contentiousness, the City passed Ordinance 1485, which is the crux of the alleged constitutional violations in this case. Subsection (k) of Ordinance 1485 provided that all permits issued before 12 July 1999 would expire automatically thirty days after the effective date of the ordinance. This portion of the ordinance allowed the City to start on a clean slate, with the end of fully enacting a more internally consistent permit system. Other portions of Ordinance 1485 amended the municipal code to require that any land disturbance work be done in anticipation of a currently-authorized use and to provide that all new permits would expire if work was suspended or abandoned or, at the outer limit, if two years had passed from issuance. The City admits that its experiences with Greenbriar were part of the impetus towards the passage of Ordinance 1485, and it is apparent that the changes accomplished by that Ordinance would serve to correct the inconsistencies that allowed Greenbriar to obtain a non-expiring land disturbance

permit in anticipation of a non-conforming use in 1999. The district court specifically found that Greenbriar's land disturbance Permit "demonstrated to the City the need for revision of the current ordinances." Greenbriar Village, L.L.C. v. City of Mountain Brook, 202 F.Supp. 2d 1279, 1286 (N.D. Ala. 2002). Furthermore, the district court found that "Ordinance 1485 targeted Greenbriar and that the City designed Ordinance 1485 to accomplish what its stop-work order could not do – force Greenbriar to cease work on its property under its existing valid permit." Id. After passage of the Ordinance, Greenbriar's Permit was the only permit in Mountain Brook that both expired and could not be renewed under the terms of the new code.

Prior to the passage of Ordinance 1485, notice was sent to all of the contractors who held land disturbance permits, informing them of the upcoming council meeting in which the amendment would be discussed and adopted.[1] For

---

[1] It is unclear from the record how this notice was served. Gregg Doody, an attorney and the principal drafter of the ordinance, testified that the city council discussed sending notice to the parties affected by the ordinance but he did not know the specifics of the notice or whether the entities received it. Greenbriar Village, 202 F.Supp. 2d at 1287; R3 at 393-94. The letters submitted as exhibits show only the address of the entity to be notified; there is no indication as to whether the letters were sent by regular or certified mail or were hand-delivered. Pl. Ex. 39. The only other record reference to the manner of service is found in a copy of an e-mail sent from city employee Vicki Thomas to City Manager Sam Gaston in which she provided information he requested "regarding the mailing information" for contractors holding permits, and asked that Gaston advise whether he planned "to send mail" to the property owners. Id.; Greenbriar Village, 202 F.Supp. 2d at 1287.

Greenbriar's Permit, notice was sent to Saiia Construction LLC, the contractor whose name appears on an increased bond for work on the property, filed in November 2002. The name of Saiia Construction appears nowhere on the land disturbance Permit itself. Rather, the only entity identified on the face of the Permit is Greenbriar. The district court concluded, based on evidence entered at trial, that "the City specifically chose not to send notice to Greenbriar of the proposed ordinance by the means customarily used." Id. at 1287. All preceding notices and correspondence regarding the Greenbriar property had been sent by the City to John De Buys, a principal of Greenbriar. Only in this one instance was notice of a proceeding affecting the property not sent directly to the listed landowner.

After the enactment of the ordinance, and after the Permit expired by virtue of the plain language of subsection (k), the City sent a letter directly to De Buys, informing him that the Permit had expired, but that the City would withhold application of the ordinance for approximately a month, until 1 December 2001, to allow Greenbriar time to discuss the matter with City officials. On 1 December 2001, following an exchange of letters between Greenbriar and the City that ultimately resolved nothing, the Permit expired and all work stopped on the property, except for emergency environmental work occasioned by heavy rains.

7

## II. DISCUSSION

Greenbriar contends that the revocation of the Permit violated its rights under the Due Process Clause of the Fourteenth Amendment to the Constitution. The district court, following a bench trial, found that Greenbriar's procedural due process rights were violated, rejected any substantive due process claim, and entered an injunction prohibiting the City from using Ordinance 1485 to deprive Greenbriar of the Permit.[2] The City appeals the district court's finding of a procedural due process violation, and Greenbriar cross-appeals the rejection of its substantive due process claim. We review a trial court's findings of fact for clear error and its legal conclusions de novo. Georgia Manufactured Hous. v. Spalding County, 148 F.3d 1304, 1307 (11th Cir. 1998). We do so with a proviso that zoning decisions, as a general rule, will not usually be found by a federal court to implicate constitutional guarantees and with a disinclination to sit as a zoning board of review. See Spence v. Zimmerman, 873 F.2d 256, 262 (11th Cir. 1989).

A. Substantive Due Process

The district court agreed with the City of Mountain Brook that no

---

[2] Greenbriar also presented a claim of denial of equal protection at trial, but the district court's rejection of that claim has not been challenged or briefed by Greenbriar on appeal. Thus, Greenbriar has abandoned that claim, and we, accordingly, do not discuss it. See United States v. Nealy, 232 F.3d 825, 830-31 (11th Cir. 2000).

substantive due process claim could succeed, and we affirm. "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty." McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc). Fundamental rights are those rights created by the Constitution. DeKalb Stone, Inc. v. County of DeKalb, Ga., 106 F.3d 956, 959 n.6 (11th Cir. 1997) (per curiam). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972); see also Vinyard v. Wilson, 311 F.3d 1340, 1356 (11th Cir. 2002). Thus, to the extent that Greenbriar predicates its substantive due process claim directly on the denial of its state-granted and - defined property right in the permit, no substantive due process claim is viable. See McKinney, 20 F.3d at 1560; Morley's Auto Body, Inc. v. Hunter, 70 F.3d 1209, 1217 n.5 (1995).[3]

---

[3] The question presented in McKinney was "whether, under the Fourteenth Amendment, a government employee possessing a state-created property interest in his employment states a substantive due process claim, rather than a procedural due process claim, when he alleges that he was deprived of that employment interest by an arbitrary and capricious non-legislative governmental action." 20 F.3d at 1553. We held that "[b]ecause employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." Id. at 1560. The only exception to this rule is when the state-created right is deprived in a manner that implicates a fundamental right, for example, when

9

Rather than base its argument on that losing proposition, Greenbriar contends that the City's action with respect to its Permit was unconstitutionally irrational and arbitrary, and that the substantive component of the Due Process Clause protects generally against arbitrary and irrational action by the government. We specifically discussed the dangers of broadening the scope of substantive due process in this fashion in McKinney. See 20 F.3d at 1559; see also DeKalb Stone, 106 F.3d at 959 n.6, 960. According to McKinney, non-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrary and irrationally. 20 F.3d at 1559. Constitutional due process is satisfied for these deprivations when proper procedures are employed.[4] Id.

_____

a state employee is fired in violation of the First Amendment for expressing his views. See Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1563 (11th Cir. 1995).

[4] The point being that the claim that the government acted arbitrary and irrationally can be easily subsumed and, indeed, is more properly considered a part of a claim that improper procedures were used in the deprivation. Claiming that the interest was deprived arbitrarily or irrationally is equivalent to claiming that no fair, unbiased, and meaningful procedures were used for the deprivation. That type of inquiry falls squarely within what we have defined (and clarified explicitly in McKinney) as a procedural due process claim.

To say the least, it is surprising that neither party in this case discussed the impact of McKinney on Greenbriar's substantive due process claim. All of the Eleventh Circuit precedent cited by the parties on these types of substantive due process claims mysteriously ends in 1994, which, curiously, is the same year that an en banc court decided McKinney. Our own research in the area reveals that many of the cases cited by Greenbriar are flagged as being cast into doubt or impliedly overruled by McKinney. Indeed, lower courts in this circuit have explicitly applied McKinney to situations involving the deprivation of land use permits. See, e.g., Malone v. Parker, 953 F. Supp. 1512, 1515-16 (M.D. Ala. 1996).

Even if we were to find that the deprivation of the land disturbance Permit did implicate constitutional substantive due process protections, the City's actions were not so arbitrary or irrational as to compel us to find for Greenbriar. See City of Cyahoga Falls, Ohio v. Buckeye Community Hope Foundation, _, U.S. _, _, 123 S. Ct. 1389, 1396 (1996). The avoidance of the harms attendant to half-completed construction is a constitutionally permissible objective for a municipality when enforcing its building code. See Spence, 873 F.2d at 260.[5] When construction on or development of a property is not completed in an expeditious manner, all types of costs accrue to the community at large: "rodents, transients, sand erosion or vandals, injuring the surrounding neighborhood economically, environmentally, and aesthetically." Id. For these reasons, a "City could rationally conclude that the building code did not intend for a building permit, once issued, to continue indefinitely. Even though there was no time limit expressed, the City could rationally interpret the Code to require that permitted construction must be substantially completed within a reasonable time of the permit's issuance." Id.

Greenbriar argues that the City revoked its Permit based on some sort of

_____

[5] Spence is a pre-McKinney case that examined the merits of a substantive due process claim resulting from the deprivation of a building permit. Of course, after McKinney, a factual situation similar to Spence would be analyzed differently.

personal vendetta against it. Certainly, the amendments to the City ordinances did affect Greenbriar more than any of the other permit holders in the city. Just as certainly, the disagreements between the City and Greenbriar about the use of the property were most contentious, and the history of litigation between the parties is apparent. However, even if we take into account all of these factors, which bear towards the conclusion that the City targeted Greenbriar specifically by enacting this ordinance, we still find that their action could not have violated substantive due process. Even with this evidence that the City targeted Greenbriar out of animosity, it is equally clear that the City was also motivated in part by a legitimate desire to enact a comprehensive and internally consistent land use system. It follows from these reasonable and legitimate governmental objectives that even if the Permit was a fundamental right protected by substantive due process, the City's actions were not constitutionally arbitrary and irrational, and the rights of the stale permit holder were not violated by revocation. Id. However, all of this discussion is merely academic, and the core reason that a substantive due process claim does not exist in this case is that no interest protected by a fundamental right is being deprived.

B. Procedural Due Process

"Due process" cases typically focus on whether governments can take away

property without affording its owner an adequate notice and opportunity to be heard. See, e.g. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-16, 70 S. Ct. 652, 657-58 (1950). When courts analyze a procedural due process claim or its analytically related cousin–substantive due process (it arises when a government egregiously or arbitrarily deprives one of his property)–they variously examine three things: (1) whether there is enough of a property interest at stake to be deemed "protectable"[6]; (2) the amount of process that should be due for that protectable right; and (3) the process actually provided, be it before or after the deprivation. See, e.g., Tri-County Paving, Inc. v. Ashe County, 281 F.3d 430, 436 (4th Cir. 2002).

Sometimes courts can moot the examination of one or two of those analytical components by passing on another. Thus, in a substantive due process case, the Supreme Court did not did not decide whether aggrieved parties possessed a property interest because the challenged government conduct was

---

[6] As the Second Circuit explained (viewing this issue through the prism of a substantive due process claim):

> Before a plaintiff seeks to prove that a state official's denial of a permit deprived him of a property right in the permit in violation of the standards of substantive due process . . . he must first establish that he has a federally protectable property right in the permit. This requires a demonstration that [at the time of the municipality's alleged due process violation,] he had a *clear entitlement* to the permit under state law.

Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999) (emphasis added).

13

simply not "egregious or arbitrary." City of Cuyahoga Falls, ___ U.S. at ___, 123 S. Ct. at 1396. Similarly, in Tri-County Paving, the court assumed a property interest existed, but concluded that the aggrieved party there failed to exploit available remedies which basically waives one's right to complain. 281 F.3d at 437-38. Finally, in Bryan v. City of Madison, Miss., 213 F.3d 267 (5th Cir. 2000), the court found that a developer's contract to purchase land did not create a protected property right for purposes of his due process claims. Id. at 275-76. It did not, therefore, consider the amount of process due or the process provided.

Here, we need not consider whether the district court correctly decided that the City failed to provide Greenbriar with adequate due process. Instead, we examine whether Greenbriar held a federally protectable property right in the first place, because no procedural due process claim exists until a sufficiently certain property right under state law is first shown. Both Greenbriar and the district court focused on the City code–specifically, the code's gaps and the City's subsequent gap-repair efforts–to support the existence of Greenbriar's estoppel-based property right. See Greenbriar Village, 202 F. Supp. 2d at 1290 (finding that Greenbriar's "property rights under applicable Alabama law rests in the doctrine of equitable estoppel"); id. at 1291-92 (finding that Greenbriar made expenditures in reliance on the City's land-disturbance permit and that Greenbriar

14

did not obtain the permit in bad faith).  There is no dispute that Greenbriar exploited an admitted gap in the City's code, ultimately obtaining from the district court a de facto commercial zoning change merely because the City was lax in maintaining a gap in its code, and, later, a little too tricky in notifying Greenbriar of its legislative efforts to eliminate it by sending notice to a Greenbriar principal, rather than to Greenbriar at its corporate address.[7]

Greenbriar thus advanced a property right derived from: (1) the City's error in creating a gap in its code; (2) the City's failure to timely halt Greenbriar's exploitation of it; (3) Greenbriar's gamble (by engaging in commercial-scale clearing of residentially zoned land) that it one day would successfully pressure the City to rezone the subject land to its liking; (4) Greenbriar's exploitation of an open-ended (time-wise) land-disturbance permit to artificially create "detrimental reliance" on a future-but-not-guaranteed commercial rezoning); and (5) the City's legally inartful efforts to repair the gap (efforts which led to this § 1983 action and the lower court's permanent injunction).  All of that occurred on a land-disturbance permit that was so open-ended that Greenbriar itself conceded that

---

[7] The injunction, after all, is permanent and, in the future, Greenbriar undoubtedly will point to its land-clearing expenditures as "vesting" additional estoppel-based property rights, thereby demanding, via mandamus, a commercial zoning change.

15

courts should simply fill in its gaps (that the Permit was valid for "a reasonable time"). See id. at 1298.

Greenbriar therefore, at most, held an uncertain property right when the City violated its zoning-notice procedures. It was not "certain" until after the alleged due process deprivation occurred. Indeed, the "by-estoppel" property right was not even recognized until the district court announced it, and even at that on legal grounds different from those Greenbriar itself proffered. See id at 1290. ("Although Greenbriar also asserts that its property rights spring from the issuance to it of a [state pollution-discharge] Permit and because of its inherent 'bundle of property rights,' . . . this court finds that the most solid basis for Greenbriar's vested property rights under applicable Alabama state law rests in the doctrine of equitable estoppel."). Further, Greenbriar relied on land use procedures to derive its property right.

Our sister circuits have held that uncertainty in the existence of a property right, especially one based on the exploitation of municipal code procedures that otherwise accorded no right to develop the property in question, does not add up to a federally protectable property claim. See Natale v. City of Ridgefield, 170 F.3d 258, 263 n.1, 264 (2d Cir. 1999) (A plaintiff seeking "to establish a federally protectable property interest in a state or local permit for which [he] has applied, . .

. must show that, at the time the permit was denied, there was no uncertainty regarding his entitlement to it under applicable . . . law, and the issuing authority had no discretion to withhold it in his particular case"; such interest is defeated by uncertainty "as to the meaning of [the] law."). The determining factor in such cases may be whether the permit-issuing government authority lacks discretion to deny the permit on which the plaintiff bases his property right. Id. at 263 ("[E]ntitlement turns on whether the issuing authority lacks discretion to deny the permit, i.e , is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met"); see also Crown Point I, L.L.C. v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1217 (10th Cir. 2003) ("[W]hen a party challenges a land use decision by a governing body on due process grounds, the proper inquiry is whether that body had limited discretion in granting or denying a particular zoning or use application"). However, such "uncertainty" is not limited to discretion-based permit issuances:

> There is no reason, however, to restrict the "uncertainty" that will preclude existence of a federally protectable interest to the uncertainty that inheres in an exercise of discretion. Uncertainty as to the meaning of applicable law also suffices. Indeed, if uncertainty as to the law did not preclude recognition of a federally protectable property interest, permit claimants would regularly be entitled to present to federal courts their disputes concerning the interpretation of local and state land use regulations. Just as federal courts are not to be turned into zoning boards of appeals, they are also not be

17

> substituted for state courts as adjudicators of the meaning of zoning and other land use regulations.

Natale, 170 F.3d at 263 (citation and footnote omitted).

Here, there existed a reasonable debate over the *meaning* of Alabama law used to recognize the Greenbriar property right that it seeks to elevate to a federally protectable level. That debate or "uncertainty" existed all the way through to the briefing stage in the district court, so it certainly existed when the City violated its zoning-notice procedures. The district court literally found that the property right came to exist over time, after the land-disturbance permit was issued, as Greenbriar developed a detrimental reliance interest in the permit. Even at that, the court only defined that property right's broad contours and failed to say when the permit expired or when the undefined "reasonable time" would end. Greenbriar, 202 F. Supp. 2d at 1292.

As with Natale, Greenbriar therefore lacked a federally protectable property interest. Greenbriar's "entitlement to the permit[] sought turned ultimately on the resolution of the parties' [] law dispute as to whether [Greenbriar] had . . . rights." Natale, 170 F.3d 263; see also id. at 264 (property owner lacked protectable property interest where the law became clear only after a state court's "refined analysis of two state statutes and a state Supreme Court decision").

18

Although Natale's rationale traveled on a substantive due process claim, we conclude that it is appropriately applied to the procedural due process claim advanced here, as we see no supportable distinction directing us otherwise. The common and key thread to these cases is the uncertainty of the property right, thus rendering it unprotectable under established federal due process doctrine. We, therefore, conclude that the district court erred in recognizing a federally protectable right under § 1983 and thus in holding that the City violated Greenbriar's procedural due process rights.

## III. CONCLUSION

We affirm the district court's decision in favor of the City on Greenbriar's substantive due process claim but reverse the district court's judgment for Greenbriar on its procedural due process claim. We therefore AFFIRM IN PART and REVERSE IN PART the district court's judgment, and REMAND with direction to the district court to vacate its judgment.